HAEGGQUIST LAW GROUP
ALREEN HAEGGQUIST (221858)
501 West Broadway, Suite A-276
San Diego, Ca 92101
Telephone: 619/955-8218
Facsimile: 619/342-7878
alreen@haeggquistlaw.com

LAW OFFICE OF HELEN ZELDES
HELEN I. ZELDES (220051)
249 S. Highway 101, #370
Solana Beach, CA 92075
Telephone: 858/523-1713
Facsimile: 858/523-1783
helenz@zeldeslaw.com

Attorneys for Plaintiff Erin Goss

FILED
2008 JUL -2 PM 3:34
CLERK US DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA
BY KNH DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN GOSS, on Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE HERSHEY COMPANY; HERSHEY CANADA, INC.; MARS, INC.; MARS CANADA, INC.; MASTERFOODS USA; NESTLE S.A.; NESTLE USA; NESTLE CANADA INC.; CADBURY SCHWEPPES PLC; CADBURY SCHWEPPES AMERICAS; CADBURY ADAMS USA LLC; CADBURY ADAMS CANADA INC.; ITWAL LTD.,<br><br>Defendants. | Case No. '08 CV 1176 J JMA<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Erin Goss ("Plaintiff"), on behalf of herself and all others similarly situated, brings this action under the federal antitrust laws, and in particular Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1 ("Sherman Act"), against The Hershey Company; Hershey Canada, Inc.; Mars, Inc.; Mars Canada, Inc.; Masterfoods USA; Nestle S.A.; Nestle USA; Nestle Canada, Inc.; Cadbury Schweppes PLC; Cadbury Schweppes Americas; Cadbury Adams USA, LLC; Cadbury Adams Canada, Inc.; ITWAL, Ltd. (collectively "Defendants"). The allegations are on information and belief, except as to those that concern the plaintiff, which are based upon personal knowledge. Plaintiff's information and belief are based on, *inter alia*, the investigation made by her attorneys.

**NATURE OF CLAIM**

1. This case arises because the world's leading manufacturers of chocolate have teamed up to fix, raise, maintain, and/or stabilize prices of chocolate in the worldwide chocolate market, including in the United States.

2. "Chocolate" includes packaged chocolate bars and similar products, industrial chocolate (melted and powdered chocolate made after processing cocoa beans sold to create a final product), and block chocolate.

3. Defendants together control almost 50 percent of the worldwide market for chocolate, and about 80 percent of the chocolate market in the United States.

**JURISDICTION AND VENUE**

4. This action arises under Section 1 of the Sherman Act.

5. Jurisdiction is founded on Section 4 of the Sherman Act, 15 U.S.C. §4, for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and 28 U.S.C. §§1331, 1337.

6. Venue is proper in the Southern District of California, pursuant to Section 22 of the Sherman Act, and 28 U.S.C. §1391(b) and (c), because one or more of the Defendants' principal places of business is here, because all Defendants are found and transact business in this district and/or the claims arose at least in part in this district. Defendants regularly and continuously conduct business in interstate and foreign commerce between and among the several United States and foreign countries. The interstate trade and commerce described herein has been carried out, in part, within this district.

## PARTIES

7. Plaintiff resides in Leesburg, Virginia. Plaintiff purchased chocolate directly from one or more of the Defendants during the class period defined below. Plaintiff has been damaged as a result of Defendants' unlawful conduct.

8. Defendant The Hershey Company is a Delaware corporation headquartered at 100 Crystal A Drive, Hershey, Pennsylvania 17033. The Hershey Company is the top-selling manufacturer of Chocolate in the United States and accounts for 45 percent of the U.S. Chocolate market. During the class period, The Hershey Company, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices that were inflated by reason of Defendants' unlawful conduct.

9. Defendant Hershey Canada Inc. is a wholly owned subsidiary of The Hershey Company, located at 2350 Matheson Bird E, Mississauga ON, L4W 5E9. Hershey Canada manufactures, distributes and sells confectionery, snack, refreshment and grocery products, including chocolate. During the class period, Hershey Canada, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct. The Hershey entities identified herein are "Hershey."

10. Defendant Mars, Inc. is a privately held corporation entirely owned by the Mars family and headquartered at 6885 Elm Street, McLean, Virginia 22101. During the class period, Mars, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct.

11. Mars Canada, Inc., formerly Effem Inc., is a division of Mars, Inc. Headquartered at 27 Holland Drive, Bolton, ON L7E 5S4. Mars Canada employs more than 700 associates at three sites, including three manufacturing facilities. During the class period, Mars Canada, Inc., directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct. The Mars entities identified herein are "Mars."

12. Defendant Masterfoods USA ("Masterfoods") is headquartered at 800 High Street, Hackettstown, New Jersey 07840. Masterfoods conducts Mars' U.S. food, snack and pet care operations. During the class period, Masterfoods, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct.

13. Defendant Nestle S.A. is a Vevey-Switzertand based multinational packaged food company that manufactures confectionery products, including chocolate. It is headquartered at Avenue Nestle 5, CH-1800, Vevey, Vaud, Switzerland. During the class period, Nestle S.A., directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct.

14. Defendant Nestle USA is a Delaware corporation with its principal place of business at 800 N Brand Boulevard, Glendale, California 91203. Nestle USA had sales of $8.5 billion in 2006. During the class period, Nestle USA, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct.

15. Nestlé Canada, Inc., a principal subsidiary of Nestle S.A., is headquartered at 25 Sheppard Avenue West, North York, Ontario, M2N 6S8, Canada. Nestle Canada, Inc. manufacturers chocolate and other cocoa products. During the class period, Nestle Canada, Inc., directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct. The Nestle entities identified herein are "Nestle."

16. Defendant Cadbury Schweppes PLC is a confectionery and beverage company headquartered at 25 Berkeley Square, London, WlJ 6HB, United Kingdom. Cadbury Schweppes plc sells its products in the U.S. through a licensing agreement with Hershey. During the class period, Cadbury Schweppes PLC, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct.

17. Defendant Cadbury Schweppes Americas is headquartered at 5301 Legacy Drive, Plano, Texas 75024. During the class period, Cadbury Schweppes Americas, directly or through its

subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct.

18. Defendant Cadbury Adams USA LLC, headquartered at 389 Interpace Parkway, Suite 1, Parsippany, New Jersey 07054, is Cadbury Schweppes' confectionery unit in the United States. During the class period, Cadbury Adams USA LLC, directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct.

19. Cadbury Adams Canada, Inc. is Canada's largest confectionery company headquartered at 5000 Yonge Street, Suite 2100, Toronto, ON, M2N 7E9. Cadbury Adams is a subsidiary of Cadbury Schweppes PLC. During the class period, Cadbury Adams Canada, Inc., directly or through its subsidiaries or affiliates, manufactured and sold chocolate to customers at anticompetitive prices inflated by Defendants' unlawful conduct. The Cadbury entities identified herein are "Cadbury."

20. ITWAL, Ltd. ("ITWAL"), headquartered at 440 Railside Drive, Brampton, Ontario L7A 1 L1 Canada, is a national network of independent, diversified retail and food service wholesale distributors. During the class period, ITWAL was aware of, coordinated and facilitated the unlawful conspiracy alleged herein.

## UNNAMED CO-CONSPIRATORS

21. On information and belief, other entities such as chocolate manufacturers or trade associations are co-conspirators with Defendants in their unlawful restraint of trade. These co-conspirators have facilitated, adhered to, participated in, and/or communicated with others regarding the conspiracy. These co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade.

## INTERSTATE TRADE AND COMMERCE

22. Throughout the class period, there has been a continuous and uninterrupted flow of transactions in and shipments of chocolate by Defendants in interstate and international commerce throughout the United States and the world.

23. The unlawful activities of Defendants and the unnamed co-conspirators have been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

**FACTS**

24. Chocolate is a commodity product that is uniform. It does not vary materially depending upon manufacturer. The chocolate produced by any defendant is fungible with any other defendant's chocolate. For example, chocolate bars manufactured by the various Defendants are sold on similar terms and in similar quantities. From a pricing perspective, chocolate bars are a relatively undifferentiated product.

25. Commencing on or around February 1, 2002, Defendants conspired, contracted or combined among themselves and with others, for the purpose of and with the effect of raising, fixing, pegging, maintaining or stabilizing the price of chocolate and other commercial conditions for deliveries of chocolate purchased by the class.

26. The chocolate industry in the United States and worldwide is highly concentrated, which facilitates the coordination of prices of chocolate.

27. Defendants collectively are the principal manufacturers of chocolate in the United States and worldwide.

28. According to published sources, three defendant manufacturers represent over 80 percent of the chocolate market in the United States. Hershey's market share is estimated at 47 percent, Mars' at 27 percent, and Nestle's at nine percent.

29. Defendants also control almost one-half of the global chocolate market. Mars has approximately 15 percent, Nestle has almost 13 percent, Hershey has approximately eight percent, and Cadbury has approximately eight percent of this market.

30. The North American chocolate market is highly integrated both in terms of trade and pricing.

31. Chocolate and other confectionery products in the United States often originate from and may be priced in Canada. The world's top four chocolate bar manufacturers have productions facilities in Canada. For example Hershey has a manufacturing facility in Smiths Falls, Ontario, that

supplies chocolate to the United States market. (All of Hershey's other facilities are in the United States.) Defendant firms have invested in Canada to obtain lower sugar costs than they would receive in the United States, and also to be able to import their chocolate into the United States under the low tariff NAFTA treaty.

32. In 2005 Canada exported over $1 billion in confectionery products to the United States. Roughly half of that number consisted of chocolate candy. Canada accounts for over 30% of the total imports to the United States of the Sugar and Confectionery Product Manufacturing industry (of which chocolate is a substantial part).

33. Chocolate and other confectionery products in Canada also originate from and may be priced in the United States. According to the US Department of Agriculture, the United States is Canada's largest supplier of confectionery products, accounting for 61 percent of the value and 65 percent of the volume of Canadian imports in 2004. The United States supplied 45 percent of Canadian chocolate candy in 2004. In 2006, the Sugar and Confectionery Product Manufacturing industry (of which chocolate is a substantial part) exported approximately $700 million to Canada.

34. Defendants make pricing decisions for chocolate centrally as opposed to region by region. As recently stated by Cadbury CEO Todd Stitzer, "We are in the process of implementing price increases in ***most of our markets*** . . . ." (emphasis added).

35. In recent years, changing consumer preferences and rising costs have hurt the chocolate industry. Yet, according to Packaged Facts, an industry publication, the United States market for chocolate rose to a record-setting $16 billion in 2006. Much of that increase in 2006 was achieved by price increases, not increased unit sales. A significant percentage of that $16 billion comprises chocolate imported from Canada.

36. In the face of these negative market trends, Defendants, the dominant players in the United States chocolate market, responded, in part, by instituting uniform price increases.

37. In March of 2007, Masterfoods increased wholesale prices of well-known chocolate bars by approximately five percent. The company cited rising costs as the basis for the price increase.

38.     In April 2007, Hershey raised wholesale prices of similar items by four percent to five percent.

39.     Contrary to the decline in sales that normally would follow a price increase under competitive conditions, Hershey announced that it expected the price increase to have "minimal financial impact."

40.     Prudential analyst John M. McMillin estimated the increase translates to about a nickel a bar, and noted that British competitor Cadbury recently raised prices and privately held competitor Masterfoods, which makes M&Ms and Mars candy bars like Snickers and 3 Musketeers, "is also taking pricing up, so Hershey is not out there alone, we think, in this chocolate price increase."

41.     On October 10, 2007 Cadbury CEO Todd Stitzer said the company expected ingredients to cost five percent to six percent more in 2008 because of rising commodity prices. "We are in the process of implementing price increases in most of our markets to offset these increases," he said.

42.     When Nestlé, which makes Nestlé Crunch and Baby Ruth candy bars, addressed investors the following week, the company's head of investor relations also discussed raising prices because of commodity prices.

43.     Shortly thereafter, Hershey boosted its wholesale prices by about three percent on one-third of its domestic candy line, covering standard chocolate bars, king-size bars, six-packs and vending lines.

44.     Many, if not all, of the price increases made by Defendants during the class period were made pursuant to the unlawful price fixing conspiracy alleged herein.

45.     In July 2007, Canada's Competition Bureau (the "Competition Bureau") initiated an investigation into the Chocolate market based on information provided by a company involved in the conspiracy.

46.     Recently, Ontario's Superior Court of Justice, East Region, issued search warrants to the Competition Bureau to investigate a scheme to fix the prices of chocolate among Hershey, Mars, Nestle, and Cadbury. Affidavits signed by an attorney in the Competition Bureau stated that the

affiant has "reasonable grounds to believe and does believe that . . . Hershey, Mars, Nestle and other persons known and unknown . . . did conspire, combine, agree or arrange with each other . . . to enhance unreasonably the price of chocolate confectionery products in Canada . . ." and "to prevent or lessen, unduly, competition in the supply of chocolate confectionery products in Canada."

47. The Competition Bureau filed the affidavits in support of a request for a warrant to search Canadian offices of Hershey, Mars, Nestlé and ITWAL. Cadbury Schweppes PLC of London, Canada's largest chocolate maker as of 2005, is not named in the request.

48. The affidavits aver that senior executives at Hershey, Mars and Nestle met secretly in coffee shops, restaurants and at industry conventions to set prices. Certain of these meetings took place at the Auberge de Pommier restaurant in July 2007 in Toronto and at food conventions in Vancouver and Niagra-on-the-Lake, Ontario in 2007.

49. The search warrants required some of the Defendants (but not Cadbury) to surrender thousands of documents and computer files that pertain to their chocolate pricing arrangements.

50. Nestle, Cadbury, and Hershey have each acknowledged that the Competition Bureau has contacted them in connection with an investigation of unlawful conduct.

51. John Pecman, the Competition Bureau's assistant deputy commissioner in the criminal division, stated that the Competition Bureau "can confirm that [it is] investigating alleged anticompetitive practices in the chocolate confectionery industry," and that "the volume of commerce affected [] is definitely potentially in the billions of dollars per year."

52. According to the affidavits, the conspiracy involved the highest ranking executives within each defendant company. Robert Leonidas, Nestle's chief executive officer, is alleged to have told a competitor, "We are going to take a price increase and I want you to hear it from the top."

53. Discussions over price-fixing continued for several years, according to the affidavits. Last July, a witness for one of the conspirators met Sandra Martinez de Arevalo, president of Nestlé Canada's confectionery business, for lunch at Auberge du Pommier. According to the witness' account, Ms. Martinez suggested that the witness' company "lead a price increase in 2007, as Nestlé

wanted to take a price increase in the third quarter." The witness said he answered that his company was not prepared to take a price increase in 2007, but might in 2008.

54. Another witness said he was approached on September 27, 2007 by Eric Lent, General Manager of Hershey Canada, at a trade association meeting. As he was getting ready to sit down at the dinner table, this witness said, Mr. Lent approached him and said Nestlé was "taking a price increase" and "so we should take advantage" or "we should increase our prices too." According to the court document, Mr. Lent continued: "Bob [Leonidas] and I talk about it all the time. It's public knowledge that Nestlé is taking its prices up."

55. During the conspiracy, Bob Leonidas, Nestle chief executive, is alleged to have handed envelopes stuffed with pricing information to a competitor with an instruction that the competitor avoid being seen picking up the information at Nestle's offices.

56. The affidavits also provided evidence that ITWAL worked with the chocolate companies to force retailers to stop cutting prices for chocolate bars. Defendants threatened to cut off the supply of chocolate to retailers that did not comply with its established pricing requirements. ITWAL's president also allegedly sent regular updates to participants of the conspiracy. For example, the Vice President and General Manager of ITWAL called one of the companies and advised them that a competitor would be taking a price increase in 2008.

57. In one memorandum to the chocolate manufacturer Defendants entitled, "TAKE ACTION NOW," ITWAL explained that "[a]t the end of the day, it is only the suppliers' control and discipline of the [discounting] that can restore the functionality of the marketplace."

58. Another ITWAL Bulletin from April 5, 2002, sent to Cadbury, Mars, Hershey, Nestle and Mars personnel, states that, "Together we can correct this destabilizing, dysfunctional and unprofitable practice [of cutting chocolate prices]. Let's get it done."

59. The U.S. Department of Justice's antitrust division has begun its own inquiry into Defendants' unlawful pricing practices in the United States chocolate market.

60. Nestle USA and Mars, Inc. have acknowledged the inquiry and stated that they will cooperate with the separate Justice Department inquiry into their United States pricing practices.

61. In mid-February German investigators raided the offices of several major confectionery companies amid allegations they fixed the price of chocolate. According to published sources, the companies Mars, Nestlé, Kraft and Ritter have all confirmed they are part of the investigation by the (German) Federal Cartel Office. "We think there was collusion on price rises," said a spokeswoman for the cartel office, adding that the investigation is expected to take several months.

62. Aside from the unlawful conspiratorial meetings specifically alleged above, Defendants also had additional opportunities to conspire. Defendants are members of the Chocolate Manufacturers Association ("CMA") and the National Confectioners Association ("NCA"), which sponsored meetings that Defendants attended during the class period. The CMA, headquartered in Vienna, Virginia, has served as the premier trade group for manufacturers and distributors of cocoa and chocolate products in the United States. CMA members produce over 90 percent of the Chocolate processed in the United States. The NCA is a trade association that represents the entire confection industry. It is one of the oldest trade associations in the world.

## ALLEGATION OF ANTITRUST INJURY

63. The combination and conspiracy alleged herein had and is having the following effects, among others:

(a) Prices for chocolate charged to plaintiff and the class have been fixed or stabilized artificially derived, non-competitive levels;

(b) Plaintiff and the class have been deprived of the benefits of free, open and unrestricted competition in the market for chocolate; and

(c) Competition in establishing the prices paid in the United States and worldwide for chocolate has been unlawfully restrained, suppressed and eliminated.

64. Plaintiff and the class members have sustained injury to their property or business as a result of Defendants' illegal and anticompetitive conduct. The injury sustained by the plaintiff and the class is the payment of supracompetitive prices for chocolate as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged.

## FRAUDULENT CONCEALMENT

65. Defendants fraudulently concealed their participation in the conspiracy alleged herein by, *inter alia*, engaging in secret meetings and communications in furtherance of the conspiracy, and by holding themselves out as competitors to the public, to plaintiff, and to the class. Because of the fraudulent concealment, and that a price fixing conspiracy is inherently self-concealing, plaintiff and the class could not have discovered the existence of this conspiracy any earlier than its public disclosure.

## CLASS ACTION ALLEGATIONS

66. Plaintiff brings this action as a class action under Rules 23(a), (b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of herself and others similarly situated. The "Class" is defined as:

> All persons or entities who purchased chocolate directly from the Defendants or their co-conspirators (the "Class"), at any time from at least February 1, 2002 to date (the "Class Period"). Excluded are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a defendant in this complaint.

67. The Class is so numerous that joinder of all members is impracticable. Given the characteristics of the chocolate market, plaintiff believes that the members of the Class are geographically dispersed throughout the world, including throughout the United States, and that joinder of all class members would be impracticable. The exact number of class members is unknown to plaintiff at this time, but plaintiff believes that there are, at least, thousands of members and that their identities can be learned from Defendants' books and records or from other sources.

68. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class purchased chocolate at artificially maintained, non-competitive prices established by Defendants and their unnamed co-conspirators in connection with the restraint of trade alleged herein. Plaintiff and members of the Class have sustained damage by payment of inflated prices for the chocolate products at issue due to Defendants' conduct in violations of federal law as alleged.

69. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation.

70. Common questions of law and fact exist as to all members of the Class that predominate over questions affecting solely individual members of the class. Among the questions of law and fact common to the class are:

(a) Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of chocolate purchased by the class;

(b) Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein and;

(c) Whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of plaintiff and the class and, if so, the proper measure of damages.

71. A class action is superior to other available methods for the fair and efficient adjudication of this controversy as joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the class. A class action will achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

72. The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for class members, while substantial in the aggregate, may not be great enough individually to enable them to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

**COUNT I**

**Violations of Section 1 of the Sherman Act**

73. Plaintiff incorporates by reference the foregoing allegations.

74. Defendants and the unnamed co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

75. The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and standardized prices for chocolate. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

76. Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants and the co-conspirators. These co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

77. The contract, combination or conspiracy has had the following effects:

(a) Prices for chocolate charged to plaintiff and the class were fixed or stabilized at higher, artificially derived, non-competitive levels;

(b) Plaintiff and the class have been deprived of the benefits of free, open and unrestricted competition in the market for chocolate; and

(c) Competition in establishing the prices for chocolate and allocating customers and territorial markets for chocolate has been unlawfully restrained, suppressed and eliminated.

78. As a proximate result of Defendants' unlawful conduct, plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for chocolate.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief as follows:

A. That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be appointed as class representatives and that plaintiff's counsel be appointed as counsel for the Class;

B. That the unlawful contract, combination and conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and that such unlawful conduct be enjoined thereunder;

C. That plaintiff and the class recover compensatory damages, as provided by Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. §15, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of plaintiff and each and every member of the Class;

D. That plaintiff and the Class recover treble damages, as provided by Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. §15;

E. That plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

F. For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

DATED: July 2, 2008

Respectfully submitted by:

HAEGGQUIST LAW GROUP
Alreen Haeggquist

ALREEN HAEGGQUIST

501 West Broadway, Suite A-276
San Diego, CA 92101
Telephone: 619/955-8218
Facsimile: 619/342-7878

LAW OFFICE OF HELEN ZELDES
HELEN I. ZELDES (220051)
249 S. Highway 101, #370
Solana Beach, CA 92075
Telephone: 858/523-1713
Facsimile: 858/523-1783

Attorneys for Plaintiff Erin Goss

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

ERIN GOSS, on behalf of herself and all others similarly situated,

(b) County of Residence of First Listed Plaintiff Leesburg, VA
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)
Alreen Haeggquist, Haeggquist Law Group, 501 W. Broadway, Suite A-276, San Diego, CA 92101, 619-955-8218

**DEFENDANTS**

THE HERSHEY CO., HERSHEY CANADA, INC., MARS, INC., MARS CANADA, INC., MASTERFOODS USA, NESTLE S.A.

County of Residence of First Listed Defendant Hershey, PA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

... DISTRICT OF CALIFORNIA
BY CNH DEPUTY

Attorneys (If Known)
'08 CV 1176 L JMA

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
- Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §1

Brief description of cause:
price-fixing

**VII. REQUESTED IN COMPLAINT:** ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 DEMAND $ CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE DOCKET NUMBER

DATE 07/02/2008 SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 152584 AMOUNT $350.00 APPLYING IFP JUDGE MAG. JUDGE

TB 07/02/08

UNITED STATES
DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 152584 - MB

July 02, 2008
15:42:21

Civ Fil Non-Pris
USAO #.: 08CV1176 CIVIL FILING
Judge..: NAPOLEON A JONES, JR
Amount.: $350.00 CK
Check#.: BC12692

Total-> $350.00

FROM: ERIN GOSS VS
THE HERSHEY CO, ET AL